PAUL B. SNYDER
United States Bankruptcy Judge
1717 Pacific Ave, Suite 2209
Tacoma, WA 98402

___✓_FILED
____LODGED
____RECEIVED

**June 27, 2008**

MARK L. HATCHER
CLERK U.S. BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA
_____DEPUTY

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON AT TACOMA

| In re: | Case No. 07-41199 |
|---|---|
| PATRICK CLARK HICKMAN, | **MEMORANDUM DECISION** |
| Debtor. | **\*\*NOT FOR PUBLICATION** |

An evidentiary hearing was held in this matter on May 7, 2008, on a Motion to Dismiss Pursuant to § 707(b)(1)[1] filed by the United States Trustee (UST). At the conclusion of the trial, the Court took the matter under advisement. Patrick Clark Hickman (Debtor) and the UST subsequently filed additional briefs on issues raised at the hearing. This Memorandum Decision shall constitute Findings of Fact and Conclusions of Law as required by Fed. R. Bankr. P. 7052. This is a core proceeding under 28 U.S.C. § 157(b)(2). Based on the evidence, testimony and arguments presented, the Court's findings of fact and conclusions of law are as follows:

### I

### FINDINGS OF FACT

The Debtor filed this case as an individual under Title 11, Chapter 7 on April 18, 2007.

---

[1]Unless otherwise indicated, all "Code," Chapter and Section references are to the Federal Bankruptcy Code, 11 U.S.C. §§ 101-1532, as amended by BAPCPA, Pub. L. 109-8, 119 Stat. 23, as this case was filed after October 17, 2005, the effective date of most BAPCPA provisions.

MEMORANDUM DECISION - 1

There is no dispute that the Debtor's liabilities consist primarily of consumer obligations. The Debtor is married to Judith M. Hickman (Ms. Hickman), and they have two dependent children, an 18-year-old senior and a 17-year-old junior in high school. The Debtor resides with his spouse and their children in Camas, Washington. The Debtor is a project manager for Intelligent Community Services (ICS), where he has worked since February, 2007. He designs home theater systems. The Debtor is currently paid a salary of $2,650 twice a month, and he receives $175 twice a month for automobile expenses.

Prior to working for ICS, the Debtor was engaged in several business ventures. In March or April of 2002, the Debtor and James McAfee formed McAfee & Hickman, Inc., and commenced doing business as Audio Video Environment (Audio Video). When the business dissolved in September, 2005, all creditors did not get paid. The debts listed in the Debtor's Schedule F, totaling $136,669, were incurred prior to dissolution in conjunction with McAfee & Hickman.

Shortly after Audio Video closed, the Debtor commenced operating his own audio-video equipment repair, sales, system design and installation work. He continued this work on a full time basis until he became employed in his current salaried position with ICS in February, 2007, two months prior to filing bankruptcy.

The Debtor and Ms. Hickman formed the Pat and Judi Hickman, LLC (Hickman LLC), in 2000, for the primary purpose of holding business properties. The Hickman LLC remains active. The Debtor also used the Hickman LLC for his audio-video business.

Ms. Hickman is the Director of Administration for Keys Limited Partnership. Her gross income as of the evidentiary hearing was $4,400 per month. Ms. Hickman testified that she is primarily responsible for the family finances. The Debtor and Ms. Hickman maintain two

MEMORANDUM DECISION - 2

family bank accounts. The Debtor's income is deposited into the Pacific West Bank account ending in 452 (Household Account 452), which is then used to pay family bills. Ms. Hickman's income is deposited into a Washington Mutual Bank account, which is also used to pay family expenses. A Pacific West Bank account ending in 401 (LLC Account) is used for the Hickman LLC. The Debtor deposited all business income into the LLC Account prior to bankruptcy. Additional funds deposited into this account prior to the bankruptcy filing included proceeds in the amount of $165,966 from the sale of a former residence located in West Linn, Oregon (West Linn House) and $15,000 in proceeds from a secured loan on the Debtor's 2004 Harley Davidson motorcycle (Harley) made by a friend of the Debtor's.

The Debtor and Ms. Hickman purchased their Camas, Washington house for $478,900 on July 19, 2005, at approximately the same time that Audio Video was going out of business. The Debtor and Ms. Hickman made a down payment $5,000 earnest money, and financed the remaining amount with a first mortgage of $307,000, and a second mortgage of $170,871. Their West Linn House was for sale at this time. Thus, the Debtor and Ms. Hickman made mortgage payments on their two homes from July, to December, 2005. The West Linn House sold for $697,000, from which the Debtor and Ms. Hickman netted $165,966 in December, 2005. These sale proceeds were deposited into a personal bank account and then immediately transferred into the LLC Account.

In July, 2006, the Debtor and Ms. Hickman refinanced the second mortgage on their Camas residence. The payoff balance at that time was $145,574, reduced by over $25,000 from the time of purchase one year prior. Funds in the amount of $25,000 from the LLC Account, specifically the West Linn House proceeds, were used to pay down the second mortgage.

On November 16, 2006, the Debtor and Ms. Hickman purchased a 2006 Chevrolet Malibu for one of their daughters for approximately $12,000 to $13,000 and placed the title in Ms. Hickman's name. The vehicle is free and clear of liens and also was purchased with funds from the LLC Account. The vehicle was not listed in the Debtor's schedules or statements as a gift to his daughter.

At the time of the bankruptcy filing, the Debtor's daughters attended a private high school. Prior to filing, in January, 2007, the Debtor prepaid tuition for the remainder of the 2006-2007 school year. Previously, the Debtor had paid the tuition bill monthly. The Debtor testified that he obtained the money to prepay the tuition by borrowing $15,000 from a friend on January 8, 2007, secured by the title to his Harley, which previously had been unencumbered. The West Linn House proceeds in the LLC Account were eventually used to pay off this secured debt owing on the Harley. Only one of the daughters attended private school during the 2007-2008 school year, and she is expected to graduate this year.

Ms. Hickman testified that prior to the Debtor's bankruptcy filing, many transfers were made from the LLC Account to Household Account 452.

On April 18, 2007, when the Debtor filed his bankruptcy petition, the Debtor filed his Chapter 7 Statement of Current Monthly Income and Means Test Calculation - Form 22A (Means Test Form). An amended Means Test Form was filed on May 5, 2008, as well as after the evidentiary hearing, on May 19, 2008 (Amended Means Test Form). On July 3, 2007, the UST filed the current Motion to Dismiss Pursuant to § 707(b)(1).

At the evidentiary hearing, one of the issues originally presented to the Court was whether the West Linn House proceeds deposited into the LLC Account in December, 2005, and subsequently withdrawn from this account to pay family expenses, could be included as

the Debtor's income for purposes of the current monthly income analysis.  The UST abandoned this argument in its post-evidentiary hearing brief.

II

**CONCLUSIONS OF LAW**

The UST brings its motion to dismiss under § 707(b)(1).  This section provides that a court may dismiss a Chapter 7 case filed by a debtor whose debts are primarily consumer debts if it finds that the granting of relief would be "an abuse."  Section 707(b) provides two alternative standards for determining whether "abuse" exists.  Under § 707(b)(2), a presumption of abuse arises where an ability to pay a threshold amount is exceeded under a means test formula.  When the presumption does not arise or is rebutted, § 707(b)(3) sets forth two different considerations for assessing abuse:  a court must consider whether the petition was filed in bad faith (§ 707(b)(3)(A)) or if abuse exists based on the totality of the circumstances (§ 707(b)(3)(B)).

The UST seeks relief under § 707(b)(2) and (b)(3)(A) and (B).

**A.      Presumption of Abuse under § 707(b)(2)**

Section 707(b)(2)(A)(i)  provides that

[i]n considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of –
            (I)  25 percent of the debtor's nonpriority unsecured claims in the case, or $6,575[2], whichever is greater; or
            (II)  $10,950.[3]

---

[2] Effective April 1, 2007, this amount increased from $6,000 to $6,575.

[3] Effective April 1,2007, this amount increased from $10,000 to $10,950.

MEMORANDUM DECISION - 5

At issue here is whether Ms. Hickman's income should be included in the Debtor's current monthly income (CMI) and to what extent there should be a deduction from business income for related expenses. The UST further identifies a slight error in one of the Debtor's expense deductions.

### 1. Ms. Hickman's Income

At the evidentiary hearing, the Debtor argued for the first time that Ms. Hickman's income should not be included in the Debtor's CMI. CMI includes "any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents . . . ." 11 U.S.C. § 101(10A)(B). Thus, if a debtor's non-filing spouse has income, that portion of the spouse's income not dedicated to paying household expenses normally is deducted from the CMI, under the "marital adjustment." The "'determination of the amount paid by a non-filing spouse on a regular basis for household expenses of the debtor or the debtor's dependents is necessarily fact specific and subject to interpretation.'" In re Sale, 2007 WL 3028390, * 5 (Bankr. M.D. N.C. Oct. 15, 2007) (quoting In re Travis, 353 B.R. 520, 526 (Bankr. E.D. Mich. 2006)).

In this case, prior to the hearing, the Debtor did not claim a marital adjustment on the Means Test Form. Moreover, the Debtor failed to present any evidence regarding funds from Ms. Hickman's income that were <u>not</u> regularly contributed to the household expenses of the Debtor or their children. Lastly, the Debtor made no argument in this respect in his post-evidentiary hearing brief. The Debtor has failed to establish the grounds for a marital adjustment in any amount. See In re Barnes, 378 B.R. 774, 779 (Bankr. D.S.C. 2007) (where the bankruptcy court held that the burden shifts to the debtor to demonstrate, by a

MEMORANDUM DECISION - 6

preponderance of the evidence, that a non-filing spouse's income is not paid on a regular basis for the debtor's household expense).

This result is consistent with the Debtor's Amended Means Test Form filed after the evidentiary hearing. The Amended Means Test Form sets forth Ms. Hickman's income as $4,483.00 and lists $0 under the marital adjustment column. Thus, Ms. Hickman's income of $4,483.00 is included in the Debtor's CMI.

### 2. Business Income

The UST does not dispute gross receipts of $9,085[4] listed on line 4a. of the Debtor's Amended Means Test Form for income from operation of a business, profession, or farm. The post-evidentiary hearing briefs establish that the remaining issue is the proper amount of ordinary and necessary business expenses that the Debtor can list on line 4b. for purposes of calculating business income.

The Debtor failed to produce documentary evidence at the hearing to establish the actual business expenses of his audio-video business during the six months prior to his bankruptcy filing. Rather than producing proof of actual expense items, the Debtor relies on the Hickmans' federal income tax returns for 2005 and 2006 to calculate the average percentage of costs of goods sold. The Debtor also relies on Ms. Hickman's testimony. As the UST correctly points out, however, neither of these establishes the expenses of the Debtor's business for the six-month period prior to filing. The Debtor has not established that the 2005 and 2006 federal income tax returns correlate to the actual expenses for the time period at issue, October, 2006, through March, 2007. Additionally, the Court excluded from

---

[4] In its post-trial brief, the UST lists business gross receipts as $9,084. Using the figures presented by the UST, however, and rounding to the nearest dollar, results in gross receipts of $9,085 (gross deposits of $54,508 divided by 6), as listed by the Debtor in the Amended Means Test Form.

MEMORANDUM DECISION - 7

evidence Ms. Hickman's testimony of possible business expenses because the underlying records had not been provided to the UST or offered into evidence. It also was established in voir dire that Ms. Hickman had no independent basis for characterizing items as business expenses, other than the Debtor's cryptic characterization of them in the check register. The Debtor did not testify as to the expenses of his audio-video business. Consequently, the Debtor has failed to meet his burden of proof.

Absent proof of actual expense items, the UST, recognizing that the Debtor had at least some business expenses, has calculated his expenses during the relevant time period based on the bank statements provided by him. In response to the Debtor's objection, the UST abandoned the method it used at the evidentiary hearing, whereby the UST looked at gross contributions from the LLC Account to Household Account 452 to establish business expenses. Instead, the UST has calculated the <u>maximum</u> <u>possible</u> business expenses during the CMI period. In reviewing electronic debits and checks from the LLC Account, the UST determined that electronic debits were solely for family and household items, while the payees on the checks were unknown. Because the UST could not determine whether the checks were for family and household items or for business expenses, the UST categorized <u>all</u> checks as business expenses, for the benefit of the Debtor. These checks total $28,432, which divided by six, results in maximum business expenses of $4,739[5] per month over the CMI period. Deducting this amount from gross receipts of $9,085 ($54,508 divided by 6), leaves business income on line 4c. of $4,346. When added to the undisputed incomes of $1,783 for the Debtor and $4,483 for Ms. Hickman, total CMI on line 12 is $10,612.

---

[5] In its post-trial brief, the UST lists business expenses as $4,738. Using the figures presented by the UST, however, and rounding to the nearest dollar, results in business expenses of $4,739 ($28,432 divided by 6).

### 3.    Expense Deductions

The UST asserts that the Debtor made one error in the expense deductions contained in Part V of the Amended Means Test Form.  The Debtor claims $412 for the vehicle operation expense, which is the standard for the Seattle Metropolitan Statistical Areas (MSA).  The correct standard for Clark County is the Portland MSA and is $379.  Thus, as set forth in the UST's Exhibit B to its post-trial brief, the total deductions allowed under § 707(b)(2) are $9,402.

### 4.    Analysis

Using the figures established by the UST, the Debtor's monthly disposable income is $1,210, and the 60-month disposable income is $72,600.  Because this latter number is over $10,950 as set forth in § 707(b)(2)(A)(i), the presumption of abuse arises.  The Debtor has not presented any argument or evidence to rebut this presumption.  Accordingly, the Debtor's case should be dismissed or converted.

## B.    Presumption of Abuse under § 707(b)(3)

When the debtor rebuts the presumption of abuse, the United States trustee has the burden of proving that the case was filed in bad faith or that the totality of circumstances of the debtor's financial situation demonstrates abuse.  In re Ansar, 383 B.R. 344, 348 (Bankr. D. Minn. 2008).  While the Court has concluded that the UST established a presumption of abuse under § 707(b)(2) and that the Debtor has not rebutted this presumption, the Court concludes in the alternative that abuse also exists under § 707(b)(3).  The Court will first examine the totality of the circumstances of the Debtor's financial situation under § 707(b)(3)(B).

MEMORANDUM DECISION - 9

### 1.  Totality of the Circumstances under § 707(b)(3)(B)

No guidance is provided to the Court in § 707(b)(3)(B) as to the factors to consider in evaluating the totality of the circumstances, other than they are to be considered as they relate to the debtor's "financial situation."  However, courts that have conducted this analysis have recognized that § 707(b)(3) is "best understood as a codification of pre-BAPCPA case law, and as such, pre-BAPCPA case law is still applicable when determining whether to dismiss a case for abuse."  In re Stewart, 383 B.R. 429, 432 (Bankr. N.D. Ohio 2008).

Factors that the Ninth Circuit Court of Appeals (Ninth Circuit) considered in evaluating the totality of the circumstances under former § 707(b) include:

> (1)    Whether the debtor has a likelihood of sufficient future income to fund a Chapter 11, 12, or 13 plan which would pay a substantial portion of the unsecured claims;
>
> (2)    Whether the debtor's petition was filed as a consequence of illness, disability, unemployment, or some other calamity;
>
> (3)    Whether the schedules suggest the debtor obtained cash advancements and consumer goods on credit exceeding his or her ability to repay them;
>
> (4)    Whether the debtor's proposed family budget is excessive or extravagant;
>
> (5)    Whether the debtor's statement of income and expenses is misrepresentative of the debtor's financial condition; and
>
> (6)    Whether the debtor has engaged in eve-of-bankruptcy purchases.

In re Price, 353 F.3d 1135, 1139-40 (9th Cir. 2004).

With respect to the first factor, post-BAPCPA cases have held that a debtor's ability to pay creditors out of future disposable income is sufficient to support a finding of abuse under § 707(b)(3).  In re Baldino, 369 B.R. 858, 860 (Bankr. M.D. Pa. 2007) (citing In re Paret, 347 B.R. 12, 16-17 (Bankr. D. Del. 2006); In re Pennington, 348 B.R. 647, 649 (Bankr. D. Del. 2006)).  At the evidentiary hearing, the Court heard testimony regarding the Debtor's current

MEMORANDUM DECISION - 10

income and expenses. The evidence presented establishes that Ms. Hickman's income had decreased since the filing of the original and amended Schedules I and J (the latter filed on August 21, 2007, only as an exhibit to the affidavit of Patrick Hickman), resulting in combined average monthly net income of $7,813.

The UST does not dispute the Debtor's expenses, including the previously-contested $200 per month home maintenance expense, except for the private school tuition. The testimony establishes that this expense would cease at the end of the 2007-08 school year. Thus, as of this decision, there remains no private school tuition expense. Accordingly, the Debtor's expenses total $7,377. Using these figures, the Debtor has net disposable income of $436[6], which over 60 months, results in $26,160 available for distribution to unsecured creditors. There is no indication that this income will not be available into the future. Rather, as shown by his $300 per month wage raise, the Debtor's income has been increasing, not decreasing.

The second factor requires the Court to consider whether the Debtor filed his petition as a consequence of illness, disability, unemployment, or some other calamity. The Debtor's business Audio Video closed in mid-June, 2005. Nonetheless, the evidence establishes that approximately sixty days later, the Debtor was engaged as a sole proprietor performing audio-video equipment repair, sales, system design and installation work. He continued this business until he obtained a salaried position with ICS in February, 2007, two months before filing bankruptcy. As set forth above, the Debtor earned $54,508 from his business during the CMI period. Additionally, for the two months prior to filing, he earned $10,700 from his

_____

[6] The UST incorrectly listed $7,277 as the Schedule J expenses in its calculation of net disposable income on Revised Exhibit C (Post-Trial). The correct figure, as listed under Total Expenses on Revised Exhibit C (Post-Trial) is $7,377. This results in net disposable income of $436.

MEMORANDUM DECISION - 11

employment with ICS.  Thus, there is no indication that the Debtor filed bankruptcy as a result of unemployment.  Rather, as stated in his post-evidentiary hearing brief, he filed "based on the failure of his business."  Specifically, he filed based on the "filing of a lawsuit by GE Commercial Credit and a failure to reach a settlement with Dr. McAfee," which transpired almost two years after Audio Video closed.  The Court concludes that this is not a "calamity" as envisioned under the Price analysis.

The third factor looks at whether the Debtor obtained cash advancements and consumer goods on credit exceeding his ability to repay them.  There is no evidence that the Debtor engaged in this conduct.

The fourth factor requires the Court to consider whether the Debtor's proposed family budget is excessive or extravagant.  Again, there is no evidence that the family budget is excessive.  The UST has abandoned its argument that the expense of $200 per month for home maintenance is excessive, and private school tuition is no longer an issue.

The fifth factor—whether the Debtor's statement of income and expenses is misrepresentative of the Debtor's financial condition—is alleged by the UST.  The UST argues that the Debtor's schedules, statements, and § 341 meeting testimony were prepared and given in such a way as to disguise, rather than disclose, the Debtor's financial history and current condition.  Specifically, the UST alleges as follows:

1) Although the Debtor disclosed four defunct businesses on Schedule B and the Statement of Financial Affairs #18, he failed to disclose the Hickman LLC, the only active entity.

2) The Debtor failed to disclose his income from the Hickman LLC on his Means Test Form and Statement of Financial Affairs #1.

3) The Debtor failed to identify the December, 2005 transfer of the Oregon residence for a net of $165,966 in response to question #10 of the Statement of Financial Affairs, or the transfer of those proceeds into the LLC Account.  When questioned about the

MEMORANDUM DECISION - 12

transfer at the § 341 meeting, his recollection of proceeds was $25,000 to $45,000 short.

4) The Debtor failed to disclose the July, 2006 refinance of the Camas, Washington residence in response to question #10 of the Statement of Financial Affairs. When questioned at the § 341 meeting, he stated that the purpose of the refinance was to obtain better terms. He did not mention that the second mortgage had already been paid down by over $25,000.

5) The Debtor failed to disclose PayPal and eBay accounts on Schedule B and a closed Washington Mutual bank account on Statement of Financial Affairs #11.

6) The Debtor failed to disclose sales of electronics equipment on Craig's list on the Statement of Financial Affairs.

7) The 2006 Chevrolet Malibu purchased five months prior to bankruptcy was not included on Schedule B, but rather was described as property titled in his wife's name and held for his daughter. The Debtor did not disclose this as a gift to his daughter. Ms. Hickman testified at her deposition that the vehicle is jointly owned by the Debtor and herself. Although purchased just prior to filing for approximately $12,000 to $13,000, the Debtor asserted a value of $8,000.

8) The Debtor had consumer debts as of the petition date that he did not disclose on Schedule F, and has stated that he filed the case solely to discharge his business debt.

In response to the UST's allegations, the Debtor responds that while he made errors in his schedules and statements, he provided to parties all of the information requested and supplemented his bankruptcy petition with the requested documentation and testimony at three § 341 meetings and one Fed. R. Bankr. P. 2004 examination. Furthermore, he contends that many of the omissions were due to his attorney's error.

The Debtor signed the schedules and statements under penalty of perjury and testified at the § 341 meeting that they were true and accurate and required no amendments. The Debtor's testimony at the § 341 hearing and Fed. R. Bankr. P. 2004 examination, however, established that the schedules and statements were not accurate. Nonetheless, the Debtor to date has not amended his schedules and statements to include the omitted information.

MEMORANDUM DECISION - 13

The Court rejects the Debtor's attempts to push responsibility on his attorney for his failure to include necessary and material information in his schedules and statements. Courts have generally recognized that the "advice of counsel" is not a defense "when the erroneous information should have been evident to the debtor." Kavanagh v. Leija (In re Leija), 270 B.R. 497, 503 (Bankr. E.D. Cal. 2001) (citing In re Tully, 818 F.2d 106, 111 (5th Cir. 1987)).

> Sworn statements filed in any court must be regarded as serious business. In bankruptcy administration, the system will collapse if debtors are not forthcoming. The record in this case shows, at the very least, cavalier indifference and a pattern of disdain for the truth. Meaningful disclosure was accorded too low a priority.

Leija, 270 B.R. at 503-04 (citing Tully, 818 F.2d at 112).

While the omissions and misstatements of the Debtor when, taken alone, do not misrepresent the Debtor's financial condition, the Court agrees with the UST that when taken as a whole, they do present a false picture of the Debtor's finances. The Debtor's lack of disclosure indicates an indifference for the truth

The final Price factor requires the Court to consider whether the Debtor has engaged in eve-of-bankruptcy purchases. The only such purchase alleged by the UST is the purchase of the 2006 Chevrolet Malibu five months prior to the bankruptcy filing and after the Debtor sought bankruptcy advice. The Debtor disputes that he purchased the vehicle, pointing to evidence that funds from the LLC Account were used and that the vehicle is titled in Ms. Hickman's name. The UST counters that the vehicle was purchased after the Hickmans moved to Washington from an account containing presumptively community income (the Debtor's business receipts), thus is presumed to be a community asset.

The Debtor's business receipts were community property. Hinson v. Hinson, 1 Wn. App. 348, 352, 461 P.2d 560 (1969) (salaries or wages earned by either spouse become

MEMORANDUM DECISION - 14

community property).  Even if the West Linn House proceeds were separate property, the presumptions in favor of community property prevail "where money in the bank cannot be segregated as to its sources and its separate and community natures have become so confused that the court cannot apportion them."  In re Smith's Estate, 73 Wn.2d 629, 631, 440 P.2d 179 (1968).  "[A]ny asset acquired from the commingled asset is community property."  In re Marriage of Shui and Rose, 132 Wn. App. 568, 584, 125 P.3d 180 (2005). Thus, when the Debtor and Ms. Hickman purchased the Chevrolet Malibu, it was presumptively community property.  Nonetheless, the evidence does not support a finding that the Debtor engaged in eve-of-bankruptcy purchases.  The Debtor is alleged to have made only one such purchase, and this occurred more than five months before his bankruptcy filing.

Considering the Price factors under § 707(b)(3)(B), a preponderance of the evidence weighs in favor of finding abuse, particularly when the Debtor has the ability to pay creditors from future disposable income.  Based on the totality of the circumstances, the Court concludes it would be an abuse to grant the Debtor relief under Chapter 7.

## 2. Bad Faith under § 707(b)(3)(A)

Section 707(b)(3)(A) requires a finding as to whether a Chapter 7 petition was filed in bad faith.  This term is not defined by the Bankruptcy Code.  The Ninth Circuit has not addressed what constitutes "bad faith" under § 707(b)(3)(A), and the Court also was unable to find an applicable case by any other circuit court.  One bankruptcy court within this circuit, however, has borrowed from the Ninth Circuit's "substantial abuse" test and from the bad faith criteria applicable to Chapter 11 and Chapter 13 cases to create a legal standard for

determining whether to dismiss under § 707(b)(3)(A).   In re Mitchell, 357 B.R. 142, 154-55

(Bankr. C.D. Cal. 2006).

> [T]he Court must evaluate whether, in light of all the relevant facts and circumstances, it appears that the debtor's intention in filing a bankruptcy petition is inconsistent with the Chapter 7 goals of providing a "fresh start" to debtors and maximizing the return to creditors. See Powers, 135 B.R. at 991-92; Marshall, 298 B.R. at 681; See also In re De La Rosa, 91 B.R. 920, 922 (Bankr.S.D.Cal.1988); In re Diego, 6 B.R. 468, 469 (Bankr.N.D.Cal.1980). In making this determination, the Court will consider the following factors: (1) whether the debtor has a likelihood of sufficient future income to fund a Chapter 11, 12, or 13 plan which would pay a substantial portion of the unsecured claims; (2) whether the debtor's petition was filed as a consequence of illness, disability, unemployment, or some other calamity; (3) whether the schedules suggest the debtor obtained cash advancements and consumer goods on credit exceeding his or her ability to repay them; (4) whether the debtor's proposed family budget is excessive or extravagant; (5) whether the debtor's statement of income and expenses is misrepresentative of the debtor's financial condition; (6) whether the debtor has engaged in eve-of-bankruptcy purchases; (7) whether the debtor has a history of bankruptcy petition filings and case dismissals; (8) whether the debtor intended to invoke the automatic stay for improper purposes, such as for the sole objective of defeating state court litigation; and (9) whether egregious behavior is present. See Price, 353 F.3d at 1139-1140; Leavitt, 171 F.3d at 1224; Marshall, 298 B.R. at 681. As in Chapter 11 and Chapter 13 cases, this Court finds that no single criterion should be considered dispositive, but rather all of the facts in a case must be evaluated. See Powers, 135 B.R. at 991-92; Marshall, 298 B.R. at 681. Finally, the Court also concludes that neither malice nor fraudulent intent by the debtor is required for a finding of bad faith under § 707(b)(3). See Leavitt, 171 F.3d at 1224.

While the "totality of the circumstances" test is included in its entirety in this "bad faith" test,

the Mitchell court declined to use this term in order to avoid confusion between the two

sections of abuse.

The Court has already considered the first six factors above in the Price analysis

under § 707(b)(3)(B). Looking at the last three factors, there is no allegation that the Debtor

has a history of bankruptcy petition filings and case dismissals.   Additionally, while the

Debtor seeks to discharge those debts from his failed business, there is no allegation that

the Debtor intended to invoke the automatic stay for improper purposes, such as defeating state court litigation.

As to the last factor, however, the UST alleges "bad faith," or egregious behavior, as evidenced by the Debtor's prepetition spending, transferring, and encumbering assets in contemplation of bankruptcy. In addition the facts asserted in support of its argument of abuse under § 707(b)(3)(B), the UST relies on the following facts[7]:

1) Upon McAfee & Hickman closing its doors in June, 2005, the Debtor purchased a home in Washington in July, 2005, before selling the home in Oregon.

2) The Debtor made substantial mortgage payments on two homes until the Oregon residence sold in December, 2005.

3) Three months before filing, the Debtor encumbered his Harley with a $15,000 loan from a friend, using a portion of the money to prepay his children's private school tuition.

While these additional facts could indicate bad faith by the Debtor, they also could merely indicate poor financial choices by the Debtor.

Considering the factors under the bad faith analysis, the Court concludes that while the facts in this case support a finding of abuse under the totality of the circumstances test, they do not rise to the level of bad faith under § 707(b)(3)(A).

**C. Ms. Hickman's Liability**

The Debtor contends that based on the law in Oregon, which is not a community property state, and the fact that Ms. Hickman was not part of the business of McAfee & Hickman, Ms. Hickman has no personal liability for the debts of the Debtor's business. The UST has not contested this assertion, but rather argues it is irrelevant to the abuse analysis under § 707(b). The Court agrees her liability is not relevant. While the Debtor may

---

[7] The UST considered these facts under the third factor of the totality of circumstances test of § 707(b)(3)(B)— whether the Debtor obtained cash advancements and consumer goods on credit exceeding his or her ability to repay them. These facts, however, do not apply to the third factor, but appear applicable to the current analysis.

MEMORANDUM DECISION - 17

ultimately establish that Ms. Hickman is not liable for the business debts of the Debtor, the Debtor has failed in his burden of establishing how or why this has bearing on the UST's motion to dismiss for abuse.

Based on the Court's determination of abuse under § 707(b)(2) and (b)(3)(B), the Debtor's case will be dismissed on July 8, 2008, unless prior to that date, the Debtor has filed a motion to convert from Chapter 7 to Chapter 13.

DATED:  June 27, 2008

_____

Paul B. Snyder
U.S. Bankruptcy Judge